Please be seated. Man quick, please call the case. Counselor, you may proceed. May it please the court, Mr. Berman and Ms. Vahey. Justice Zia, first of all, good afternoon. I represent Barry Dorfman in the appeal of the removal that was granted by the trial court, Judge Archambeau presiding down in Will County. Granting leave for Ms. Dorfman to remove the party's two children now aged, or one of the salient facts that we've raised on appeal, besides the fact that the court failed to completely analyze both Eckert and Collingborn, is the fact that the court gave little weight, if any, to the fact that Ms. Dorfman had improperly removed the party's children prior to filing her petition for removal, which the court seemed to actually weigh in favor of the removal, or basically allowing the self-help to weigh in favor of a removal. And also, most importantly, as it relates to the issues of the visitation schedule, which was granted by the trial court, which was actually not granted by the trial court, I should say. One of the main factors which the trial court seemed to rely upon in terms of a reasonable and realistic visitation schedule being in place for my client, Mr. Dorfman, was that the use of Skype or telephone contact would be a primary mode of visitation form. Clearly, the court unfortunately failed to take into consideration the January 1st, 2010 amendments to section 609, specifically section 609C, which forbids the court from using electronic communications as a factor in favor of a removal. Let me start off by first saying that one of the major factors that the trial court used in favor of granting the removal was the past violations by Mr. Dorfman of orders of protection. There are three orders of protection ultimately issued to Ms. Dorfman. The first being granted to her in January 2008, which was later dismissed on her own motion. The second- Wasn't it rolled into the divorce proceeding when they had a no contact order? That was the second. The first one, Justice O'Brien, she dismissed in hopes of saving the marriage. The second one she got in May of 2008 wasn't consolidated or was dismissed based upon the mutual restraining order granted in the case of the divorce case. The third and final order of protection that was granted to Ms. Dorfman was entered in July of, it was July 28th of 2008. The record is replete as the criminal cases were, where my client was convicted of, actually I believe he pled guilty to two misdemeanors and pled guilty to the third felony. Every single one of those, he was wrong. I'm not going to sit here and try to tell anybody. I think we, the actual words I used in my briefer, he went overboard, period, repeatedly, period. No question he did that. That does not create a removal. What he did, went overboard, the words that he used, the language that he used, sending these emails, telephone messages to the direction of the party's children, as the court trough were even rendered in, stated in its decision. He knew that Ms. Dorfman was going to get them and not the children. None of these were ever going to get to these kids, and everybody knew it. One of the underlying principles of our justice system, especially the criminal justice system, is not only to punish behavior, but also try to work towards rehabilitation. Barry got up on the stand, and he was pro se during the trial, and every single thing that counsels asked him, you said this, you said this, this is the recording from Okina Police Department. Yep. All of them were. Every single thing that he did that initiated an order of protection or required the initiation of criminal proceedings by the state's attorney's office, he did that. But the first two times in Deseret Carrie, he was very rehabilitated because he violates an order and then violates another order. He gets, what, two weeks in jail and then like a month in jail. I mean, it seems that he apparently doesn't seem to understand that when he goes overboard, first of all, he's committing a pretty serious offense, and that it takes at least three times, giving him a great benefit of the doubt, for him to realize that he was wrong because he keeps continuing the behavior. I'm not going to disagree with you just so far. I mean, he actually, it took him to get that felony. It took him to six months in prison, and that's what he testified to. How, and given that, when you look at that, you know, he's going to be able to follow court order and the visitation rights, and how is it that you'd have some comfort that he's going to obey the court order if his behavior shows that he doesn't care what the law is, he does what he wants? Because this gets to exactly what the GAL, I think the GAL report actually goes to that issue specifically, that given the fact that all of his violations and all of the behavior that led to the order of protection dealt with the emails and the phone calls, he gets to do all those still, regardless of if a removal is in place or not. I mean, there's nothing by her moving to Atlanta, Georgia, that could potentially stop that. As of, I believe, 14 days from today, I believe the testimony was June 22nd, is when he gets his ankle bracelet off. He can move down to Georgia and continue it all over again. Yeah, but Georgia allows their citizens to protect themselves a lot better than they do here in Illinois. I would presume that would probably be true, but I couldn't even say for sure just as whole. Well, right to carry concealed weapons, et cetera. Illinois doesn't allow that. Right. I didn't know that they were carrying concealed, I'm sorry. How good was he about visiting the children? What the record demonstrates is that for the period of time, obviously, when he was in prison, he had no visitation. I'm not talking about the prison time, I mean otherwise. Otherwise, this is actually confusing between the court's decision and what the record is, because in the court's decision it states that he would only exercise approximately 10 days. Because of his failure to abide by Supreme Court rule, I believe it's 903, related to the parenting class, he technically couldn't have visitation until August of 2010. So his visitation under the judgment for dissolution of marriage, I believe, was actually denied for his failure to abide by the parenting class. So by the time he comes and gets out of jail, he does the parenting class right away, files a certificate with the circuit court that he's now completed the parenting class, so now he's allowed visitation. However, she's already removed the children two months prior, down to the state of Georgia. So we're really, while everyone wants to say that he hadn't abided by or hadn't been exercising the full visitation rights, from, I believe it was May of 2009 when the judgment was entered up until August of 2010, he was actually denied visitation rights due to his failure to attend the parenting classes and file that certificate with the trial court. Where would you lay the blame there? I would lay the blame on him. From what I can tell, it appears that Ms. Dorfman actually attempted to, despite the fact that there was no visitation granted to him, at least work with his mother and or his sister to try to give him some visitation. However, the other thing that we state in our brief, and I think it's important, is that for the first seven and five years of these children's lives, respectively, they saw their father on a daily basis. Mr. Dorfman did not handle well the divorce. And again, I told him the same thing that I would tell you in the same things in our brief. You were wrong. However, this does not create, I don't believe, some new almost area of jurisprudence. The extent of 609, this automatically creates the best interest for the children to be removed, especially given Ms. Dorfman's testimony. Her testimony in the trial court was that the schools in Jordan were quote commensurate. Mr. Dorfman testified, without being impeached, that the schools were actually worse than the schools in the Mokina, that the children were attending in Georgia, were worse than the schools that they were attending in Mokina, or better than Georgia. I apologize. That was completely not rebutted by Ms. Dorfman. It wasn't impeached. And he stated, I believe, during his testimony that it was based upon his research. So to the schools, we have in Ms. Dorfman's testimony a push, in Mr. Dorfman's testimony getting worse. Ms. Dorfman left and gained full employment, and for at least the six months that she had been residing in the state of Georgia, still hadn't found any employment. So how did that increase her general quality of life? It didn't. I state that the example that she set for her children are if you pick up and leave and you rely on grandfather, or in her case her father, for the complete and only means of support. I mean, she had gained full employment that she had had for some period of time that was flexible. She was allowed to, the GAL report actually states that it neared the exact same school schedule that the children had. Now, granted, Ms. Dorfman said that her supervisor told her that the flexibility may be going away in the future. But it seems speculative in terms of her testimony that this type of flexibility for the children's school system, as well as her own job in the school system, was going to go away. When we examine the reasonable, or the likelihood of the move enhancing the general quality of life of the children, as well as the custodial care, no one's ever going to stand up here in any removal case, I would say, and say that whoever is requesting the removal, that person's general quality of life, that custodial parent's general quality of life wouldn't be enhanced by the removal. Absolutely every person who files for removal believes that or else they wouldn't be wasting their money and the court's time. But how, it's the causal nexus, and it's conjunctive, not disjunctive, that it's got to be an increase in the general quality of life of their parent requesting the removal and the children. So reading that, as the Supreme Court stated, it's conjunctive in both Ecker and Collinghorn. Instead of disjunctive or the or, it's either or for the parent or for the children. It is Collinghorn's statement. So you don't see the nexus there of the mother being in fear of the father having some impact on the children? That it could have some impact on the children, yes. That it rises to the level, in this case, of demonstrating best interest when you're taking the entire case and all of the Ecker factors into consideration. I think there's a palpable nexus, there's no question, that she will feel better. But how that relates to the actual best interest of the children being increased, I'm not sure how the testimony shows that or how any of the evidence shows that. GAO report, which was admitted in evidence, says that there is no real benefit that's discernible to the children. What do we use, though? I mean, courts are allowed to use the facts of the domestic battery or domestic violence in determining the best interest of the children. Absolutely, which then gets to another issue, is that there's actually never been a section 607 here within the divorce case to find that Mr. Dortman presented a serious endangerment or that visitation by Mr. Dortman will present a serious endangerment to the children's mental, physical, or emotional well-being. Aren't the convictions or his pleading guilty of those presumptions? I don't, with all due respect, Justice O'Brien, I don't believe that they are, because all of those had to deal with Ms. Dortman. There's no question that Ms. Dortman and Mr. Dortman shouldn't have contact. But there's no allegations as to issues or things that he did to the children, which is related to the GAO report. Right, but I don't think the statute requires that. I think the statute says that the violence against the custodial parent, the previous violence, if that results in a conviction, that you can, that that conviction is evidence or it can be used, if we apply this balancing act, as to the children. I think when you're, if you're talking about section 607, I think it's 607 D or E, specifically. I don't, with all due respect, I'm not sure that domestic violence is actually one of the crimes that's solicited. I believe it's sexual abuse or assault on a minor under 18 years of age and murder. If I remember 607, those are the actual specific presumptions that are created in terms of a denial of visitation. Mr. Dortman did stipulate that at the present time, at the time of the trial, that he would agree to continue supervised visitation. If anything, that basically, I would say, gives him credit that he sees the hole that he dug himself. And that even if removal were granted or denied, that he still was going to need to show the court more. That he had been on the road to rehabilitation. And the GAO report, and even GAO's statements that weren't her sworn testimony, but rather occurred prior to the trial commencing, were that we needed more information as it related to Mr. Dortman's psychological state. I'll show you two minutes. Thank you. So, given that, I would say that there really hasn't been, and even the original denial of the visitation, as I spoke with you, Justice Carter, was due to his not attending the parenting class, not because of actual serious endangerment that was proved by clear and convincing evidence as it related to the children. But why was he ordered to do the parenting class? Because under at least the 12th Judicial Circuit's interpretation, after Henry GP came out from this court, was that all parents need to attend that parenting class. And so, I can tell the court, as a practitioner of the 12th Judicial Circuit, as well at least in the 13th in Grundy County, if you don't attend your parenting class, it's a rule of show of cause against you. In general, the sanction that's provided, or that the courts have interpreted, the sanction that's provided for failure to attend the parenting class has been a denial of visitation until you attend the class. Finally, I would just like to say... My point is, the court system thinks, by ordering that, that there is a connection between at least attending a class and learning about your parenting responsibilities and getting visitation. That's absolutely what the Supreme Court Committee has determined. From a practical point of view, as a practitioner, I'm not sure that enough people actually pay attention to the class, and I wish more people did. I wish that, frankly, there was better guidelines from the Supreme Court as to what more of the content should be. But that's more my practical practitioner's point of view than necessarily the interpretation of 902 or 903. I'd just like to close it. Really, there's no reasonable or realistic visitation schedule that's been granted to my client. Counsel, in their brief, brings up post-trial motions, which are not part of the common law record, which are not part of the record, and really requests that you basically ignore them under Supreme Court Rule 341 as it relates to anything that occurred post-trial, post the notice of appeal. There is no reasonable and realistic visitation. For ten months of the children in school, Mr. Dorfman gets 48 hours, less than once per month. That's what the J.L. report demonstrates. How can there be a continuing relationship under Section 102 of the Dissolution Act, as well as Ecker, that each child has this stalwart principle of a close and continuing relationship with the other parent, is completely obliterated in this case by what the court deemed to be a reasonable and realistic visitation schedule, only looking at the past up until June 22, 2011, because that's what the trial court relied on, was the ankle monitoring and the order of protection. And the order of protection can always be modified to allow for the visitation, along with whatever is granted in the D case. So we respectfully request that you reverse the trial court's decision, at least as it relates to the visitation, and preferably as it relates to the entire granting of the removal of her men to the trial court with specific directions as it relates to the visitation and or the return of minor children to the state of Illinois. Thank you. Thank you, Counsel. Sasha. May it please the Court. Good morning, Your Honors. Mr. Johnbeck. I'd like to start out talking about the standard of review in these types of cases, which Your Honors are very well aware of. The trial court's determination of what's in the best interest of minor children should not be reversed unless it's clearly against the manifest weight of the evidence. This is because the trier of fact had significant opportunity to observe the parties and assess their temperaments, personalities, and capabilities. And Judge Archambault did all this and made a decision based on the evidence that removal was proper. Counsel's already discussed the accurate factors. Subsequent to Eckert, the Supreme Court pointed out that the accurate factors are not exclusive and that these cases need to be examined on a case-by-case basis. And this case, from what I've read of the other cases, is quite different. Collingborg directed trial courts to not view the benefits children may experience as a result of the move as direct or indirect. If only direct benefits that affected children were considered, rarely would a situation arise where removal would be permitted where children were in a good environment, good schools, had good family, and good parents. The court points out that what's in the best interest of the children cannot be assessed without looking at what's in the best interest of other members of the children's household, most specifically the custodial parents. It's proper to consider the financial and emotional well-being of the custodial parents, along with that of the children, when deciding the improvement in the quality of life of the children. The first accurate factor looks at the likelihood of the proposed move enhancing the general quality of life for both the custodial parents and the children. The benefits to Beth as an individual, to Beth as a mother of two children, and to her two children are clear. Beth can physically distance herself from Barry, a man who frankly terrorized her for years. Beth is terrified of Barry, and the trial judge agreed that Beth's fear of Barry is well-founded in fact. Barry was obsessed with this idea that Beth was having an affair. Beth testified he'd follow her around the house interrogating her, wake her up in the middle of the night interrogating her, and accuse her of having affairs with basically every man she talked to, the handyman, her boss, her brother-in-law, anyone he could think of. He got Beth to take a lie detector test, and he tested her clothing for sperm. When Beth finally got up the nerve to leave Barry, he left hundreds of horrifying, threatening, terrifying emails and voicemails, some of which were directed at Beth, but most started out, hi kids, hi Dylan and Laney, directed at their children. He called her every name in the book, wished her death over and over again, asked that his own children join him in his hopes that their mother got hit by a truck and died a painful death, and threatened to carve an A into Beth's heart. Three orders of protection did not stop Barry. Two misdemeanor convictions for violations of order of protection did not stop Barry. The threat of a felony conviction did not stop Barry. Being locked up in jail for six months and being put on house arrest put him on pause, but after he was released, he did reference in a phone call the movie The Grudge to one of the children, which is a movie where the father kills the mother and the children because the mother was having an affair. In my opinion, Barry's just getting a little smarter in the way that he terrorizes Beth. As he said in one message to one of Beth's friends who had to obtain an order of protection against him, you think I'm crazy, you might be right, but I'm smart, which makes me a dangerous kind of crazy, and I agree with that. Barry left this message because he didn't just terrorize Beth, he basically went on a full-scale campaign to terrorize anyone who helped Beth out. Three people besides Beth had to get orders of protection against Barry. He sent a letter to all her relatives revealing any kind of private thing he could think of, which Beth confided to him when she was his wife, including her secret that she had had a child which she had given up for adoption when she was young. Barry was institutionalized at least seven times, although he told the GAL three times. He made multiple suicide attempts, punched himself in the face to the point that he broke bones, engaged in obsessive behavior, but claims that it was nothing more than situational depression and he was drinking a little too much for a while. Barry says the doctor who diagnosed him with borderline personality disorder was wrong. Barry says he doesn't need any medication to manage his psychiatric problems. Barry stopped taking Lexapro, a drug a doctor described, without any doctor telling him to. He blames everything on alcohol, and he received no alcohol treatment. He does see a psychiatrist, but admitted he never told the psychiatrist about a single one of his institutionalizations, a single one of his suicide attempts, his diagnosis of borderline personality disorder, nor any drugs he was previously prescribed. He also admitted that he lied and told the psychiatrist he had no issues with alcohol and he'd just have a couple drinks a week. The trial judge, in her opinion, notes that Barry's failure to recognize his shortcomings and his tunnel vision blaming everything on alcohol, as well as his lack of candor to his psychiatrist, is of concern. And it concerns Beth, too. The trial court correctly saw Barry for what he is, a danger to Beth. There were at least two instances of physical abuse that Beth testified to, but Barry's campaign of terror was far more damaging to Beth. If the things Barry did are not enough to make a reasonable person need to get away from him, need to cross state lines to get away from him, to feel safe, it's hard to imagine what Barry would have to do in order to make a reasonable person want to escape from him. By distancing herself from Barry, Beth can build a life with her children without constantly looking over her shoulder. The odds of Barry injecting himself into her personal relationships are less when she has physical distance from him. True, as counsel has mentioned, Barry can go back to terrorizing her via phone and email, but she sure feels a heck of a lot safer being states away and living in a house with her dad instead of living in a condo alone with the two children. In his brief, counsel quotes the Creevey case as supporting the idea that domestic abuse isn't enough to support the granting of a removal petition. But that case is different from this case because the court specifically points out there's no pattern of abuse, and also the father in that case had not missed a single visitation, which, as I'll discuss in a moment, is much, much different than Barry. Beth can function better as a mother to her children when she's away from Barry. That's the nexus that counsel says doesn't exist. Beth was struggling at work, often calling in sick as his release from prison neared. She was emotionally falling apart, that's what she testified to, because she had an extremely challenging and draining job working with children with severe emotional and behavior disorders, which she felt certain she was about to lose. A healthier, happier Beth is a clear benefit to her children. There's also financial benefits, as Barry has not paid a dime of support since the party's divorce, even though he did receive unemployment income for a while. His past employment record is dismal. His last job he held in 2008 for one day. The job before that he had for seven months before he was fired. And his odds at obtaining future employment are not that good, considering this recent felony conviction. Beth's father welcomed her and the children into his home, where he pays the mortgage, utilities, bills, and helps provide things that they need. Her stepmother also lives in the home, and the children enjoy a close relationship with both of them. Beth does have relatives in Illinois, but none of these relatives can provide anything close to the financial and emotional support that Beth's father offers, as well as what I discussed, the safety of living in a house with other people. As Beth testified, her father is a backup for discipline, provides childcare, and can just help her out and give her a break so she can regroup and work on rebuilding her life with her children. Beth testified that there's better employment opportunities in Georgia, because jobs which require an advanced degree in Illinois only require a certificate in Georgia, which she obtained. She did leave her job in Illinois, where she was earning $48,000, but she's qualified for jobs in Georgia, where she can earn $60,000 to $70,000. I want to mention the Guthrie case, which cites, it's very similar to this case. The father had a dismal employment record, and he provided inadequate financial support to mother. Mother had more realistic employment opportunities in the removal state, and mother's family would be able to provide her support and assistance if the move was allowed, and the court decided to grant their removal. The children's school in Georgia offers additional curricular programs, which Beth testified to, such as including the seven habits of effective kids. Beth testified that children participate in many extracurricular activities there, and that they're scheduled at the children's school, which makes it easier for them to be involved in more things. Beth testified that Dylan, her son's tic disorder, has greatly reduced since she moved to Georgia, and Lainey told the GAL that her life would be ruined if she had to move back to Illinois. She told the GAL her dad says inappropriate things about mom, and she thinks dad will hurt mom. And she also told the GAL she was tired of Barry talking about her mother, and that she remembers Barry pushing Beth and throwing her keys. Lainey would benefit from this move because she's worried about her mom, something a little girl, I wish, didn't have to go through. The distance between Beth and Barry can help alleviate Lainey's pay risk, and hopefully aid Barry in getting over this obsession he has with Beth, because, as he told the GAL, he plans on writing a book about Beth, and is in the process of doing so. The court looked at the motives of the custodial parents and of Barry, and found that both of those motives were in good faith. Beth brought the children gifts from Barry while he was in prison, and is raising them in Barry's faith, the Jewish faith. I would just like to mention about Barry's motives, that in the case In Re Marriage of Maine, the court questioned the father's motives in resisting removal, as he had failed to exercise visitation previously granted to him. In this case, Barry's interest in seeing his kids was basically non-existent, until he discovered Beth planned to take them out of state. The fourth factor is a reasonable and realistic visitation schedule. The court has defined this as one that will preserve and foster the child's relationship with the non-custodial parents. This decision is based in part to the extent to which the non-custodial parent has exercised his visitation rights. Barry has not diligently exercised his visitation rights. On May 30, 2008, an order was entered granting him visitation five times per week. On August 21, 2008, an order was entered granting him supervised visitation two times per week. Then from December 22, 2009 to June 22, 2010, Barry was incarcerated. For 763 days, more than two years, that passed between May 30, 2008 and June 22, 2010, Barry saw his children ten times. We've heard some testimony that's because Barry didn't take a parenting class. Well, that's Barry's fault. Now Barry claims that any schedule the court would set would be unreasonable. Beth testified not that Barry would have 48 hours a month with the children. She testified that the kids' school year starts in August, that they have four one-week breaks and one two-week breaks. So that's a total of six weeks during the school year where she wanted them to have visitation with Barry. She also testified that if Barry could have overnights, she'd be in agreement with some extended visitation over the summer. So if Barry visited with the children for six weeks during the school year and six weeks in the summer, he would see the children for 84 days a year, which is eight times more than the ten days that he saw them in two years prior to this whole removal issue. Barry can't argue based on his horrible record of visiting with his children that the proposed schedule is unreasonable. I'd like to bring Your Honor's attention to the Ray Ponds case. In that case, a mother's petition to remove children to Switzerland was granted. The court pointed out the father had exercised only half his visitation for the last several years. And that the visitation mother proposed in the removal case, if he used that visit, he'd actually see the children more than he had prior, just like Barry. Thank you. I'd just like to briefly touch on the fact that the court did not set a visitation schedule. Everyone had agreed, the parties, the GAL and the court, that it would be okay if the court decided the removal issue and then later decided the visitation issue. Because what the visitation would be, it would depend on whether the removal was granted or not. Whether we're dealing with in-state visitation or out-of-state visitation. Also, Barry's visitation is complicated because it's restricted. It was previously decided that he needed a supervisor. He was on house arrest at the time. Also, during a hearing held December 22, 2010, the court and the GAL both suggested that they were uncomfortable either proposing or ordering a visitation schedule without further knowledge of Barry's mental health condition and that they wanted more records. Both the court and the GAL suggested that we hold the removal hearing and then later hold this hearing on the visitation when we had more records. Neither the removal statute nor ECCRT requires that the trial court set a visitation schedule as part of its petition to remove. It asked the court to consider whether a reasonable visitation schedule can be reached and consider the visitation rights of the non-custodial parent, which the court did consider. As far as this Skype issue, there's one sentence in the court's opinion that talks about Barry can have telephonic and Skype visitation with the children. I think that just putting in this one word, Skype, is not the one thing that tipped the court's decision over the edge in this three-day-long removal hearing. Skype is basically the same as a telephone, except you have some video images. I'd argue that the mere mention of the word Skype does not result in this decision being against the manifest weight of the evidence. Therefore, I respectfully request this court affirm the trial judge's decision to grant Beth Dorfman's petition to remove. If your honors don't have any questions, I'm finished. There's no prohibition against the trial court considering Skype technology as an enhancement to visitation. It just can't be a substitute. Is that correct? That's my understanding, your honor. Thank you. Thank you, counsel. What the trial court, as well as counsel's argument, does, in this case, in fact, replaces the father with the grandfather. That the grandfather is the one who's going to provide the home. The grandfather is the one who's going to provide for backup for discipline. The grandfather is going to be the one who is going to basically take care of all the children's needs, as well as mom's needs. There's no cognizable legal right, as opposed to a remarriage, to ensure that Beth actually gets any support from her father. Today, tomorrow, or a week ago. At least in the case where we remarried with the Hope for Maintenance Award. We don't have that with the father-daughter relationship, at least from a legal, cognizable standpoint. What support do we have from the father? In this case, as of yet, there has admittedly been minimal. But at the same time, she walked away from a $48,000 a year job. She may qualify for employment, as counsel referred to, in the state of Georgia. There's no testimony or evidence in the record as to when she would get a job, what the job market was like, or what the availability of the jobs that she qualified for were down in Georgia. So to the extent of... But why is that important, if she has, in effect, income from other sources sufficient to provide for herself and children? Why is the Hope job and income she earns so critical? Well, I think that it is critical in terms of her ability. Once we look at, if you take into account Section 505, that both parties have the obligation to support the children. How is she going to support these children? Well, through her father. And if her father kicks her out, then where are we at? That's a case for a different day, isn't it? Not really. I mean, there's nothing in the Act that says you have to have a job. You just have to be able to provide. Exactly. And how do we know that she's going to be able to provide? We don't. We know that at the time of the hearing, somebody was assisting her and supporting her. In most cases of removal, it's, generally speaking, in a case like this, pretty replete with the fact that it's the new spouse, or the potential new spouse, that lives out of state, which is why the removal requesting parent is required. It's just a job substitute. You and I have jobs that assist us in our lifestyles, okay? I think it's a terminology issue. It's a question of fact. I would agree, Judge Solders, that it is a question of fact. But it becomes a question of potential concern, given the situation, that there is no guarantees. Nor is there any of our jobs. That's also correct. Well, if she was ordered to come back, she doesn't have a job, and neither does he, apparently. So I guess at least she has found a way to provide for them, because he hasn't paid any child support. She was in jeopardy of losing her job anyway. So, I mean, what's he done to satisfy the conditions of 505? And since the entry of the removal order, I honestly couldn't tell you. Prior to that, it appeared that you'd only been out of jail for approximately six months. And due to the fact that he was under continued house arrest, I don't think he had an ability to- I mean, again, that was his fault. I'm not asking for pity on him due to his own actions. And I think that his own actions were, again, overboard, and that he didn't handle the divorce well. But how did- You know, I guess I'm a little offended at calling a felony offense and something that he's admitted to just going overboard. A lot of people don't handle divorce well, but they don't send emails and texts threatening to kill someone, or the kind of behavior that this man demonstrated that he's quite capable and comfortable with. So I guess I'm a little upset with that. And, you know, you're asking us to say-to make an exception for his ability to support his kids because he was in jail, but that we should look and frown upon the fact that she found a reasonable solution to her fear and to go live with her dad. So being clear, you're so right. I'm only saying that as one of the factors. Clearly, he has an obligation to support his children, just as every single parent does on the face of the planet. Whether you're divorced or married, I think you still maintain an obligation to support your children. And for him to go through jail, and hopefully from what the testimony was and what the GAO report was, is that if our criminal justice system is supposed to not only punish but also to rehabilitate, it seems that he's finally-maybe it took too long. It probably did take too long. It should have never gotten to the point that it did. I can't disagree with that. But if the underlying principles of criminal justice, of punishment and rehabilitation, are ready to be afforded, they should be afforded to Mr. Dorfman as well. Now, given the restrictions that are on him, if that's been the cause of the problem, I don't know that there's actually testimony in the record that that's been his specific problem with gaining employment since his release from prison in June of 2010. I just don't believe the testimony was actually in the record. I think there's some insinuation from the GAO report that that was the situation, but I don't think that he actually ever testified to it nor that anyone else actually testified to it. Thank you. As it relates to the issue of ordering her back, which I believe you had brought up, Justice Holders, this gets to maybe my fundamental problem as more of a practitioner than there's a huge issue of self-help in this case. That 619 specifically provides for a temporary removal. She filed a petition stating that she was a resident and residing in Illinois in August of 2010. She testified to the fact that she left in June of 2010. The General Assembly has specifically put parameters and requirements for removal in place. They were not abided by. There's no exception for fear. There's nothing that says that she couldn't have filed before she left. I don't even believe the common law record demonstrates that there was a request for a temporary removal. They just filed the removal, waited four or five months to have the hearing, and then ultimately the removal was granted. So perhaps from more of a practical standpoint in reading the statute, somebody was rewarded to an extent for their bad behavior. The children, yes, Laney said she does not want to come back, but that shouldn't have never been the case in the first place from a purely procedural standpoint. And I guess that's also an issue that there's some evidence of reward in the court's decision for actually not violating the statute and not abiding by the act. Thank you. Thank you, Justice Holders. Thank you. We will take this case under advisement and rule with dispatch post haste. And we'll take a brief recess now for a panel change after lunch.